ALEX G. TSE (CABN 152348)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

ROBERT S. LEACH (CABN 196191)
Assistant United States Attorney

LORI A. HENDRICKSON (OHBN 0067831)
Trial Attorney
U.S. Department of Justice, Tax Division

   1301 Clay Street, Suite 3405
   Oakland, California 94612-5217
   Telephone: (510) 637-3918
   Fax: (510) 637-3724
   Email:   Robert.Leach@usdoj.gov
               Lori.A.Hendrickson@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 17-491 RS |
| Plaintiff, | UNITES STATES' SENTENCING MEMORANDUM |
| v. | |
| G. STEVEN BURRILL, | Sentencing Date: December 4, 2018 |
| Defendant. | |

## INTRODUCTION

On December 7, 2017, defendant G. Steven Burrill pleaded guilty to one count of investment-adviser fraud and one count of filing a false 2010 individual income tax return. The defendant is scheduled to be sentenced on December 4, 2018.

On July 18, 2018, after a three-week trial, co-defendant Marc Berger, CPA, was convicted of three counts of aiding and abetting the filing of Burrill's false individual income tax returns. Berger is scheduled to be sentenced on December 14, 2018.

At Berger's trial, the government proved Burrill stole $12,628,126 from the Fund during the years 2010 through 2013, evading the payment of taxes of $2,912,303 on that unreported income. Burrill's reputation as a successful manager of venture capital funds of companies in the life sciences and biotechnology industry allowed him to commit these crimes because people trusted him. He committed the crimes because he was greedy, and he used the embezzled funds to pay for office rent, payroll, personal vacations and substantial improvements to his residence in Wisconsin. Because of his theft, the Fund was unable to make investments in biotechnology companies that may have provided a much greater return on investment for the investors during the planned ten-year life of the Fund that began in 2006 (Burrill was removed as the managing partner at the end of 2013 when the limited partners learned of his theft).

Burrill's conduct merits a substantial prison sentence. He breached his fiduciary duty to the limited partners of the Fund. He did not report more than $12 million in embezzled income to the IRS. In white-collar crimes, general deterrence is an important factor at sentencing, because businessmen often weigh the risks of financial gain against the risk of punishment before committing a crime. A 63-month prison sentence for Burrill would send a compelling deterrent message to others who would consider breaching their fiduciary duty and stealing money from their clients or investors. A sentence of 63 months in prison is also necessary to satisfy the mandate of 18 U.S.C. Section 3553(a) that the sentence reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct.

**SUMMARY OF BERGER TRIAL EVIDENCE RELEVANT TO BURRILL**

The defendant, G. Steven Burrill was a Certified Public Accountant ("CPA") prior to his career as an investment fund manager. The defendant owned and controlled Burrill & Company LLC ("B&C"), Burrill Capital Management, Inc. ("BCMI"), Burrill Capital, LLC ("B-Cap") and Burrill Capital Management, LLC ("BCM") (collectively, the "Burrill Entities"). Through the Burrill Entities and other entities, Burrill managed investment funds, including Burrill Life Sciences Capital Fund III, L.P. (the "Fund" or "Fund III").

Fund III was a $283 million investment partnership whose purpose was to make venture capital fund investments. Ex. 703A. Under the terms of the limited partnership agreement ("LPA") and other operating documents, Burrill was to call capital to invest in biotechnology companies and his management company was entitled to a 2% annual management fee payable quarterly. *Id*. The LPA prohibited loans and prepaid management fees. Ex. 703A; Tr. at 107:22-108:3, 135:24-136:9, 377:19-24, 389:17-20, 393:5-10 (testimony by Burrill employee Roger Wyse and investor representative Craig Demko that they did not agree to loans or advanced management fees).

The biggest investor to the Fund was the Treasurer of the State of North Carolina, which contributed $50 million to the Fund. Craig Demko testified at Berger's trial that the money invested with Burrill by the State of North Carolina was intended to increase the pension funds of law enforcement officers and school teachers, among other state employees. The Treasurer of the State of North Carolina was also a member of the Fund's advisory committee, and Demko testified they were required to pass on all conflicts. Ex. 703A. Burrill told investors he would not make investments with affiliates without consent and he was not entitled to any fees above the management fee. Ex. 702.

In December 2007, Burrill started transferring money from the Fund to his management companies in advance of when he was entitled to it. Helena Sen and Jean Yang both testified the Fund's money was used to pay operating expenses of Burrill's management companies. Sen and Yang recorded the transfers in the Prepaid Expense account in the Fund's books and in the Deferred Revenue account in the management company Burrill Capital LLC's books. Exs. 223, 790. All BPM witnesses and the government's expert Revenue Agent ("RA") James Oertel testified that deferred revenue is taxable as income no later than the year after receipt.

Between May and December 2012, Berger repeatedly urged Burrill to execute a promissory note to support the loan theory. Ex. 323; Ex. 508 (Berger "strongly recommend[ing]" "documentation of Promissory note" and the "[n]eed to ensure there is documentation"); Ex. 353.

On April 3, 2013, Sen emailed a signed a promissory note to one of the accountants at PricewaterhouseCoopers ("PwC"), who were finalizing the audit of the Fund's 2012 financial statements. Ex. 644. The unsecured promissory note was barely more than one page and purported to secure a "series of prior loans" from the Fund to Burrill Capital, LLC. The note was signed by Burrill in his capacity as the manager of Burrill Capital, LLC. There was no signature line for anyone from the Fund (which is not surprising since none of the investors and no one on the Fund's advisory board was aware that Burrill had advanced himself millions of dollars in management fees).

After receiving the signed promissory note from Sen, the Fund III auditors at PwC insisted it be disclosed in the Fund's 2012 financial statements. Exs. 645 & 647. Burrill refused to make the disclosure and therefore withdrew the note.

In August 2014, Berger testified in a deposition related to the SEC investigation. During that deposition, he testified that he had informed Burrill he had tax exposure without a note. Ex. 523A.

## FACTUAL BACKGROUND

**Procedural History**

On September 15, 2017, a 34-count Indictment was filed, charging G. Steven Burrill with violations of 18 U.S.C. §§ 1343 and 2 – Wire Fraud and Aiding and Abetting (Counts 1-26), a violation of 15 U.S.C. §§ 80b-6 and 80b-17, and 17 C.F.R. §275.206(4)-8 – Investment-Adviser Fraud (Count 27); violations of 26 U.S.C. § 7201 – Tax Evasion (Counts 28-31); and charging Marc Howard Berger with violations of 26 U.S.C. § 7206(2) – Aiding and Assisting in the Preparation of a False Tax Return (Counts 32-34).

On December 6, 2017, a two-count Information was filed, charging G. Steven Burrill with a violation of 15 U.S.C. §§ 80b-6 and 80b-17, and 17 C.F.R. §275.206(4)-8 – Investment-Adviser Fraud (Count 1); and a violation of 26 U.S.C. § 7206(1) – Filing a False Tax Return (Count 2).

**Offense Conduct**

In his Plea Agreement (Doc. 27), the defendant admitted that from 2006 through 2013, he controlled the management of the Fund, which was governed by a Second Amended and Restated Limited Partnership Agreement ("LPA") dated September 15, 2006. Burrill represented to the limited partners that he was not entitled to receive any fees from the Fund except as expressly provided in the LPA. The LPA also required the defendant to promptly submit all potential or actual conflicts of interest involving the General Partner and the Fund to an advisory committee for resolution.

He also admitted that beginning in or about December 2007, through in or about October 2013, he intentionally deceived the limited partners by, among other things, improperly taking money from the Fund that he knew his management companies were not entitled to. He also admitted he induced limited partners to contribute capital to the Fund with misleading capital call letters and caused the Fund to transfer money in excess of the management fee due as provided in the LPA (and that would ever be due) to the Burrill Entities.

Burrill also admitted that he caused his employee, Helena Sen, to sign his name to and send capital call letters to limited partners demanding the payment of cash. These capital call letters falsely stated that the proceeds of the capital calls would be used for purposes consistent with the LPA. Burrill knew these letters were false because at the time the money was withdrawn from the Fund, he intended to transfer the money to his own management companies to pay operating expenses, not to make new investments. Burrill admitted that by October 2013, the money he had withdrawn from the Fund and given to his own management companies was $8 million more than he was entitled to in management fees through the life of the Fund, set to expire in 2016.

Burrill also admitted that his 2010 U.S. Individual Income Tax Return, Form 1040, that reported $0 in taxes, was false because it did not include $4,680,748 income for the advance management fees he paid to himself and his management companies in 2010. Burrill made similar admissions for 2011, 2012 and 2013.

**Tax Loss Computation**

Burrill's individual income tax returns for 2010, 2011, 2012 and 2013 were introduced at Berger's trial as exhibits. Exs. 10-13. Burrill reported the management fees he earned for managing the Fund as income on a Schedule C for Burrill Capital, LLC. The yearly amounts were the sum of the quarterly fees he earned, which were recorded in the books in journal entries that reduced the balance in both the Fund's Prepaid Expense account and Burrill Capital's Deferred Revenue account.

As charged in the Indictment, Burrill's 2011 tax return reported Total Income of a negative $245,870 (therefore a loss) (Count 32). Burrill's 2012 tax return reported a loss of $875,845 (Count 33) and his 2013 income tax return reported a loss of $850,491 (Count 34). In general, a true loss could be carried back or carried forward to offset income in other years. RA Oertel's computations of Burrill's unreported income and taxes due were consistent with the amounts listed in the defendant's Plea Agreement and set forth below:

| Year | Unreported Income | Additional Tax Due |
|---|---|---|
| 2010 | $4,680,748 | $1,565,973 |
| 2011 | $4,444,052 | $568,326 |
| 2012 | $3,067,406 | $759,329 |
| 2013 | $435,920 | $18,675 |
| **Total** | **$12,628,126** | **$2,912,303** |

The annual management fees earned by Burrill (and reported on the Schedule C in the name of Burrill Capital, LLC) from 2010 through 2012 ranged from approximately $5.2 million to $5.6 million. Exs. 401, 402. When the unreported income was added to the figures reported on the tax returns filed with the IRS, the reported losses were eliminated. Similarly, losses claimed on Burrill's 2014 and 2015 individual income tax returns may not be used to offset any of this income, because those losses included losses from prior years that were eliminated. See attached schedule analyzing the net operating loss (NOL) and unreported income. Sentencing Exhibit 1.

**Guidelines Calculation**

In the Plea Agreement, the Adjusted Offense Level for Investment-Adviser Fraud was calculated to be between 8 and 26, based on a loss of between $0 and $9.5 million. Doc. 27 at 8. The defendant has no criminal history. PSR ¶ 62. The Guidelines range for Offense Level 26, Criminal History Category I, is 63-78 months.

The Adjusted Offense Level for Filing a False Tax Return was between 19 and 21, based on a tax loss of between $550,001 and $2,912,303. The parties believed the two offenses would be grouped for purposes of the Guidelines calculation.

The PSR calculated the Adjusted Offense Level for Investment-Adviser Fraud to be 28. PSR ¶ 37-43. The Adjusted Offense Level for Filing a False Tax Return was 24. PSR ¶ 44-49. The PSR did not group the two offenses, which resulted in a multiple count adjustment increase of two levels to an Adjusted Offense Level of 30. PSR ¶ 50-53. With a reduction of three levels for acceptance of responsibility, the Total Offense Level was 27. PSR ¶ 54-57. The Guidelines range for Offense Level 27, Criminal History Category I, is 70-87 months.

**Statutory Maximum Penalties**

As set forth in the Plea Agreement, the statutory maximum penalties for Count 1, Investment-Adviser Fraud, in violation of 15 U.S.C. §§ 80b-6 & 80b-17 & 17 C.F.R. § 275.206(4)-8, are five years in prison, a fine of $250,000, three years of supervised release, and a mandatory special assessment of $100. The statutory maximum penalties for Count 2, Filing a False Tax Return, in violation of 26 U.S.C. § 7206(1), are three years in prison, a fine of $250,000, three years of supervised release, and a mandatory special assessment of $100.

**Restitution**

Pursuant to PSR ¶ 25, the Fund's losses sustained from Burrill's theft was $17,637,759, and the Fund has recovered $12,054,040 pursuant to settlements. The defendant should be ordered to pay the difference of $5,583,719 to the Fund (the litigation costs of $4,606,394 may not be recovered as part of restitution). As set forth in Plea Agreement ¶ 9, payment of the Fund's restitution has priority over the restitution to the IRS. To assist the clerk of courts in

processing restitution payments to the Fund, the government requests the Court include the following information in the judgment:

Burrill Life Sciences Capital Fund III, L.P.
C/o James C. Rutten, Munger, Tolles & Olson LLP,
350 South Grand Avenue, 50th Floor
Los Angeles, California, 90071-3426

Defendant should be ordered to pay restitution to the IRS of $2,912,303, which constitutes income tax due for tax years 2010, 2011, 2012 and 2013. The tax loss due for 2010 is $1,565,973, for 2011 is $568,326, for 2012 is $759,329, and for 2013 is $18,675. Plea Agreement ¶ 9, Exs. 401, 402. To assist the clerk of courts in processing restitution payments, the government requests the Court include the IRS's centralized location for collection of restitution payments in the judgment:

IRS - RACS
Mail Stop 6261, Restitution
333 W. Pershing Ave.
Kansas City, MO 64108

## ARGUMENT

"In sentencing defendants, district courts exercise a guided discretion within a range specified by Congress. As Justice Cardozo wrote, a 'judge . . . is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to the primordial necessity of order in the social life.'" *United States v. Smart*, 518 F.3d 800, 809 (10th Cir. 2008) (citation omitted).

In considering what sentence to be imposed in any given case, the Court must consider the factors listed in 18 U.S.C. § 3553(a). One of those factors is "the kinds of sentence and sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines," which are promulgated by the Sentencing Commission. 18 U.S.C. § 3553(a)(4)(A). Although the Sentencing Guidelines have been rendered advisory, according to the Supreme Court in *Gall*:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. . . . As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however.

> Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district court should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. . . . He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

*Gall v. United States*, 552 U.S. 38, 49-50 (2007) (citations omitted). "[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)). "The sentencing judge, on the other hand, has 'greater familiarity with . . . the individual case and the individual defendant before him than the Commission or the appeals court.'" *Id*. at 109 (*quoting Rita*, 551 U.S. at 357-58).

The U.S. Sentencing Commission issued a policy statement regarding tax fraud. It said: The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators. U.S.S.G. § 2T1.1, introductory cmt. (2016). In *United States v. Engle*, 592 F.3d 495, 505 (4th Cir. 2010), the Fourth Circuit vacated a probationary sentence in a tax case and remanded, based in part on the district court's failure to consider the relevant policy statements and found that "the district court committed significant procedural error by minimizing the seriousness of [defendant's] conduct . . . ."

The court in *Engle* pointed to these particular policy statements made by the Sentencing Commission and noted that "[t]he policy statements . . . reflect the Commission's view that

general deterrence – that is, deterring those other than the defendant from committing the crime – should be a primary consideration when sentencing in tax cases." *Id*. at 501. "The policy statements likewise make it clear that the Commission believes that there must be a real risk of actual incarceration for the Guidelines to have a significant deterrent effect in tax evasion cases." *Engle*, 592 F.3d at 502. A significant prison sentence for Burrill will have a significant deterrent effect on business owners and venture capital fund managers who may consider cheating on their income taxes.

In *United States v. Sample*, 2018 WL 4056013 (10th Cir. 2018), the Tenth Circuit held that a sentence of five years of probation for a defendant-broker who had defrauded investors of more than $1 million was substantively unreasonable. The defendant's Guidelines range was 78 to 97 months, but the defendant argued to the district judge that he should receive probation because of his "charity and volunteer work. . . and his previous financial support of his family and friends." *Id*., *2. When announcing the sentence of five years of probation, the district judge said that part of his reasoning was the defendant's current "job and his earning capacity" which would allow the defendant to pay restitution to the investors he defrauded. *Id*.

The Tenth Circuit said that a judge "should not rely on a defendant's wealth in fashioning a sentence (citations omitted)." *Id*., *3. *See also United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) ("Business criminals are not to be treated more leniently than members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity."). The Tenth Circuit also emphasized the fact that the defendant had inflicted "considerable harm" on his victims when he misappropriated more than one million dollars, and that fact alone "weighs against the lenient nature of the sentence that the trial court imposed." *Sample,* *3.

The Tenth Circuit noted that the defendant's lack of a criminal history, his acceptance of responsibility and the likelihood the defendant would not commit future crimes were not sufficient reasons to justify the significant downward variance from the Guidelines range. The Tenth Circuit observed that the district court failed to consider several factors under § 3553(a), including the need to promote respect for the law, provide just punishment for the offense, and to

afford adequate deterrence in criminal conduct. *Sample* at *4. As support for this statement, the court listed several citations, including *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("[T]he Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense."); S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime."). "White collar criminals may be particularly susceptible to general deterrence because "[d]efendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013). *Sample* at *4.

## CONCLUSION

For the reasons discussed above, the Court should sentence defendant G. Steven Burrill to 63 months in prison, order him to pay restitution to the Fund of $5,583,719, restitution to the IRS of $2,912,303, and to serve three years of supervised release.

Dated: November 29, 2018

Respectfully Submitted,

ALEX G. TSE
Acting United States Attorney

/s/
_____
ROBERT S. LEACH
Assistant United States Attorney

LORI A. HENDRICKSON
Trial Attorney
U.S. Department of Justice, Tax Division